MAIRE M. RUONA, PLAINTIFF AND APPELLANT, v. CITY OF BILLINGS, A MUNICIPAL CORPORATION, ET AL., DEFENDANTS AND RESPONDENTS.

No. 9673.
Submitted January 21. 1958, Decided March 14, 1958.
Rehearing denied March 14, 1958.
323 Pac. (2d) 29.

555

Arthur R. Meyer, Billings, for appellant.

James F. Battin, City Atty., Richard J. Carstensen, Asst. City Atty., Billings, argued orally for respondents.

THE HONORABLE VICTOR H. FALL, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, delivered the Opinion of the Court.

This action was commenced by appellant owner against the City of Billings, the chief of police, the mayor and the two

policemen for damages in the sum of $1,000 for the destruction of her dog, Kimi.

The stipulated facts in this appeal reflect the following:

On or about January 27, 1951, a stray dog in the City of Billings attacked and bit a person, and it was determined upon proper examination that the dog was suffering from rabies, a violent, dangerous and infectious disease, and it was presumably destroyed. The Montana Livestock Sanitary Board immediately conferred with the local health and law enforcement officers of Yellowstone County and the City of Billings regarding steps to be taken to cope with the situation. An emergency quarantine of all dogs and cats located within the general area known as the College Subdivision was ordered, requiring that all such animals be kept confined and that all stray dogs and cats be "shot and killed". On March 5, 1951, a second rabid dog bit a child in Billings. The dog was destroyed. Realizing the full seriousness of the situation, on March 16, 1951, the Montana Livestock Sanitary Board ordered an emergency quarantine for all of Yellowstone County, Montana, and ordered that all dogs and cats be vaccinated for rabies and that they be restrained by means of chains or kept within escape-proof pens, and for destruction of all dogs and cats running at large.

During the months of March and April 1951, "several" dogs were found to be infected with rabies. On the morning of March 25, 1951, the dog of appellant, together with a canine companion, was reported to the Billings police to be roaming at large. It is stipulated that these two dogs "chased a small, four-year old child on the street, who escaped on a neighborhood porch." The two police officers, Staton and Glasrud, respondents herein, were in a patrol car, and pursuant to radio call, located the two dogs. They attempted to capture them by whistling and calling. Failing in their efforts, they shot and killed appellant's dog, Kimi. The companion dog escaped.

Appellant assigns as error the overruling of her demurrer

to the first affirmative defense and the granting of the motion for judgment on the pleadings in favor of respondents.

Appellant argues that she has been deprived of property without due process of law and cites our statute section 19-103, R.C.M. 1947, and the appropriate constitutional provision, Art. III, section 27, Mont. Const., in support thereof.

It should be pointed out that our Constitution also provides that, " * * * the police powers of the state shall never be abridged, or so construed * * * as to infringe * * * the general well-being of the state." Art. XV, section 9, Mont. Const. It is so well-settled as to hardly need citation of authority that under the guise of police power the state and the municipal subdivisions thereof have not only the power, but the duty to do all things necessary to fully protect the public in matters of the preservation, among other things, of the health and well-being of the community. For example, we find the following statement in 11 Am.Jur., Constitutional Law, section 245, pp. 966, 969, 970:

"The breadth and extent of the police power, covering the exigencies confronting the community, its adaptability, durability, inalienability, and the number of public purposes included in its scope make it a principal pillar of government. It has been stated that the police power in effect sums up the whole power of government, and that all other powers are only incidental and ancillary to the execution of the police power; it is that full final power involved in the administration of law as the means to the attainment of practical justice. Moreover, it has been said that the very existence of government depends on it, as well as the security of the social order, the life and health of the citizen, the enjoyment of private and social life, and the beneficial use of property."

"Salus Populi and the Law of Necessity: Another principle involved in the police power is expressed by the well-known maxim, 'salus populi est suprema lex.' [The welfare of the people is the supreme law.] It has been said that this maxim

558

is the foundation principle of all civil government and that for ages it has been a ruling principle of jurisprudence." 11 id. section 251, page 977.

"Thus, in a great many decisions it has been said that the police power extends to protection of the public health, safety, and morals; to the securing of the public peace, good order, health, safety, morals, and general welfare; to the protection of the lives, limbs, health, comfort, and quiet of all persons and the protection of all property within the state, including public property; to the promotion of the comfort and welfare of society; and, in addition, to the enhancement of the public convenience and the general prosperity." 11 id. section 270, pp. 1015-16-17-18.

Under police power the state can provide for the destruction ██ of diseased animals. 11 id. section 271; see annotation 8 A.L.R. 810. This power has been upheld whether provision has been made for compensation to the owner or not. See 2 Am. Jur., Animals, section 160, page 810. As stated in the text just cited, at page 811, "Proceedings for the destruction of property in many cases must necessarily be summary and without a previous trial or hearing in such cases, and such proceedings are due process." Citing cases in note 3.

Under the general provisions of section 69-121, R.C.M., 1947, the State Board of Health has the power and the duty to establish and enforce quarantine measures when necessary. It is the duty of, among others, police officers to enforce such measures. Section 69-608. It is further provided by section 46-243, that no officer, agent or employee of the Board shall be liable for their acts thereunder except in case of "wilful wrong or gross negligence".

In addition to the foregoing, the following quotation from ██ In the Matter of Viemeister v. White, 179 N.Y. 235, 238, 72 N.E. 97, 70 L.R.A. 796, found in Chalfin v. American Soc. etc., 184 Misc. 15, 53 N.Y.S. (2d) 174, 178, seems particularly appropriate, wherein it is said:

" 'When the sole object and general tendency of legislation is to promote the public health, there is no invasion of the Constitution, even if the enforcement of the law interferes to some extent with liberty or property' ".

Again the Chalfin opinion quoting from the case of In People ▉ ex rel. Knoblauch v. Warden, of City Prison, 89 Misc. 243, 245, 153 N.Y.S. 463, said:

" 'Any rule made by the board of health which has a reasonable and direct relation to securing protection from bites of animals which may be rabid is therefore a proper exercise of its functions. The relator does not dispute that this is the law, but urges that the ordinance under consideration goes beyond the needs of the situation. It must be remembered, however, that the determination as to the means of meeting a threatening situation has been vested in the board of health, and not in the courts. ' "

The Chalfin case then states:

"The resolution of the Board of Health is a valid and reasonable exercise of the police power of the state. It is a measure designed for the protection of the public and to secure the public from the dangers of rabies, a noncurable disease with a 100% mortality. The natural right of liberty and property must occasionally yield if such sacrifice is necessary in order that organized society as a whole may be benefited. The inevitability of death, once the disease is contracted, the fact that six months may elapse between the date of the dog's exposure to rabies and the first manifestation of the disease in the dog, the fact that there are no known tests or examinations which will determine whether an animal which has been exposed to rabies will eventually prove to be rabid, and the fact that a dog in the first few days of infection may present no symptoms of the disease and yet may transmit the disease to other animals or humans, all argue in favor of the reasonableness and necessity of the resolution which is being attacked."

See also Fox v. Mohawk & H.R. Humane Society, 165 N.Y.

517, 59 N.E. 353, 354, and Preudhomme v. Stebbins, 55 N.Y.S. (2d) 397.

Bearing in mind that at the time of the adoption of the emergency measure, several people had been bitten by rabid dogs in the City of Billings; the fact that months may elapse before rabies, even when contracted by a dog, may make its appearance; the inevitably of death if the disease is contracted; the knowledge of appellant of the existence of the emergency quarantine measure; of the fact that appellant's dog was roaming at large and had chased a small child shortly before its destruction; the efforts of the police officers to peaceably catch and control the dog before its destruction, all add up to the proposition that had the officers failed to do what they did do, they would have been subject to severe criticism for neglect of duty. And this is true regardless of any statutory or constitutional provisions whatever.

The foregoing will not be construed as any indication by this court as a license to any person, whether acting under public authority or not, to embark upon a course of wanton and indiscriminate destruction of dogs. Each case must be decided upon the particular state of facts present.

The judgment of the district court is affirmed with costs.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICES CASTLES and ANGSTMAN concur.

MR. JUSTICE ADAIR concurring in part and dissenting in part:

I concur in affirming the district court's judgment herein but do not concur in all that is said in the foregoing opinion.

Ours is a government of *law*, not of men. It is a government of written law duly enacted by the legislative department and authority of the state. Constitution of Montana, art. IV, section 1, and art. V, section 1; State ex rel. Driffill v. City of Anaconda, 41 Mont. 577, 583, 584, 111 Pac. 345.

In Montana, "*Law* is a solemn expression of the will of the

supreme power of the state." Emphasis mine. R.C.M. 1947, section 12-101.

"The will of the supreme power is expressed:

"1. By the constitution;

"2. By statutes." R.C.M. 1947, section 12-102.

"The organic *law* is the constitution of government, and is altogether *written.* Other *written laws* are denominated statutes. The *written law* of this state is therefore contained in its constitution and statutes, and in the constitution and statutes of the United States." Emphasis mine. R.C.M. 1947, section 93-1001-9.

The legislative authority of this state has not, as yet, seen fit to enact into our codes or statutes either the so-called *"Salus Populi and Law of Necessity"* or the maxim *"Salus populi est suprema lex"* and such is no part of the *written law* of Montana.

Likewise I am unable to agree with the statement in the foregoing opinion to the effect that "under the guise of police power" the state and the municipal subdivisions have either the power or the duty, in the absence of any statute or constitutional provision so providing, "to do all things necessary to fully protect the public in matters of the preservation * * * of the health and well-being of the community."

A court has no power to do anything not authorized by law, nor do the executive and administrative boards and officers of the state or of the municipal subdivisions thereof possess the authority or power to do anything not authorized by written law.